Enrique "El Red" GARCIA, Appellant,

v.

STATE of Texas, Appellee.

No. 13–86–117–CR.

Court of Appeals of Texas,
Corpus Christi.

Aug. 29, 1986.

Rehearing Denied Oct. 23, 1986.

Oscar J. Pena, Sr., Laredo, for appellant.

Rogelio Rios, Dist. Atty.'s Office, Laredo, for appellee.

Before NYE, C.J., and UTTER and KENNEDY, JJ.

## OPINION

NYE, Chief Justice.

This is an appeal of a denial of a request for habeas corpus relief. The case arises out of an incident in which appellant is alleged to have fired a shotgun at two police officers, striking and killing one (Serna), but missing the other (Ayala). The incident occurred on September 11, 1984, and appellant was indicted for capital murder in the death of Officer Serna on September 17, 1984. A jury found appellant guilty of voluntary manslaughter on December 14, 1984, and assessed punishment at twenty years' imprisonment and a $10,000 fine. On July 8, 1985, appellant was indicted for attempted capital murder for shooting at Officer Ayala.

Appellant challenged this second indictment by an application for writ of habeas corpus. He claimed that, because the two shots were fired in rapid succession and the jury in the capital murder case found that he was acting under sudden passion arising from an adequate cause, the State is collaterally estopped by that verdict from trying him for attempted capital murder of the other officer. After two hearings on appellant's request, it was denied. We reverse.

This case undisputedly involves two shots, two victims, and two offenses. The questions center on whether there was but one mental state, whether that mental state was the ultimate issue in both cases, and whether that issue was conclusively determined against the State in the first trial.

During the first hearing on appellant's request, he introduced the statement of facts from the capital murder case into evidence over the State's objection. That statement of facts from the trial on the merits is voluminous, with testimony and exhibits covering over 1,100 pages. Needless to say, we will give only a cursory summarization of that record.

The incident occurred in Laredo, Texas, in a neighborhood known as "La Colonia Guadalupe," characterized by the State as an "extremely bad area of town with a high incidence of crime." There is evidence in the record of long-standing hostilities between the Laredo Police Department and many of the residents of the neighborhood, particularly appellant and his family. Not surprisingly, there is a wide divergence in the evidence between the accounts of the incident given by the State's witnesses and those given by the defense witnesses.

Late in the evening, on September 11, 1984, several police officers responded to a disturbance call at the Colonia. A woman had complained of young people harassing her and vandalizing her property. Appellant's sister, Eliza, was apparently involved, and the police attempted to arrest her and her brother, David. There was evidence that both Eliza and David are mentally retarded. The officers testified that Eliza and David were abusive and belligerent, and violently resisted arrest. Defense witnesses testified the officers were abusive and brutal while arresting the two. At some point, appellant's mother and other siblings joined in the fracas. The officers testified the family members assaulted them and impeded the arrests. The family members testified that Eliza and David were being savagely beaten, and that they were merely trying to stop the attacks.

This altercation erupted into what could be characterized as a street brawl. The police officers repeatedly called for reinforcements. Accounts placed the number of police officers at the scene at between nine and possibly fifteen. A "belligerent crowd" began to gather and grew to one to two hundred people, in one officer's estimation.

Appellant was identified as being present during the "arrest" of his sister and broth-

er, and, although he appeared to be angry and upset, he did not participate in any of the physical struggles between his family and the officers. He was standing on the periphery of the parking lot, where the incident initally began, with a friend of his, Hernan Cortez. An officer at the scene, Castelar, testified that appellant threatened to kill him. Officer Reyes testified that Cortez and appellant threw rocks at him. He heard a rock hit a patrol car and saw appellant making a follow-through motion as if throwing a baseball. Reyes said he considered this act an aggravated assault on a police officer. There was evidence of "bad blood" between Reyes and Cortez.

At some point, appellant left the parking lot and was seen returning across the street to his residence. Reyes claimed that Cortez continued to taunt him, and was luring him to the Garcia residence. Officers Reyes and Evans gave chase and followed Cortez into the residence and down a hall into a bedroom. There, both officers testified that Cortez resisted arrest and put up a fierce struggle. Defense witnesses testified that Cortez was severely beaten by the officers and later required hospitalization.

Officer Sam Ayala participated in the arrest of David. He saw Officers Reyes and Evans chasing a subject (Cortez). He followed to give assistance. Officer Victor Serna had also arrived on the scene at this point and saw Reyes and Evans giving chase. He joined up with Ayala. Serna was running just ahead of Ayala, toward the Garcia residence. The officers ran up the Garcias' driveway, then ran behind an unfinished cinderblock building, and were about to enter the residence when two shotgun blasts rang out.

The front door of the residence was directly across a pathway from a window in an adjacent cinderblock building. The record is unclear, but, apparently, the shots came from that window. Ayala was the only eyewitness to the shooting. He said he heard a shot and saw Serna fall to the ground. Ayala turned toward his left and saw appellant holding a shotgun. He said

he heard a "clack-clack" noise as appellant pumped the shotgun and fired again, at him. He heard the second blast but jumped out of the line of fire and behind a wall.

Officer Evans testified that, while he was in the residence attempting to subdue Cortez, he heard the "first boom and then a couple of seconds later [he] managed to walk up to the door and heard the second boom." Evans said he saw a fire-flash in the window of the unfinished building and returned fire in that direction.

During the guilt/innocence phase of the capital murder trial, the State presented the testimony of some twenty-nine witnesses, including Ayala, the only eyewitness to the shootings, and fifty-four exhibits. In its charge to the jury, the trial court submitted instructions on capital murder and murder. The trial court also submitted an instruction on voluntary manslaughter which stated:

> If you believe from the evidence beyond a reasonable doubt that on or about the 11th day of September, 1984, in Webb County, Texas, on the occasion and at the time and place in question, the defendant did intentionally or knowingly cause the death of Victor Serna by shooting him with a shotgun, but you further find and believe from all the facts and circumstances in evidence in the case that the defendant, in killing the deceased, if he did, acted under the immediate influence of a sudden passion arising from an adequate cause, then you will find the defendant guilty of voluntary manslaughter; or if you have a reasonable doubt as to whether the defendant, in so causing the death of Victor Serna, if he did, acted under the immediate influence of sudden passion arising from an adequate cause, then you will find him not guilty of voluntary manslaughter.

### 10.

You are instructed that you may consider all relevant facts and circumstances surrounding the killing, if any, and any previous relationship existing between

the accused and the deceased, if any, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense, if any.

\* \* \* \* \* \*

If you should find from the evidence beyond a reasonable doubt that the defendant is guilty of either murder or capital murder on the one hand, or voluntary manslaughter on the other hand, but you have a reasonable doubt as to which offense he is guilty, then you must resolve that doubt in the defendant's favor and find him guilty of the lesser offense of voluntary manslaughter.

There is ample evidence in the record to support the trial court's submission of this instruction on the lesser included offense.

■ "Collateral estoppel" is that principle of law which means that, "when an issue of fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Ashe v. Swenson,* 397 U.S. 436, 443, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). The United States Supreme Court held in *Ashe,* that the doctrine of collateral estoppel is embodied within the fifth amendment's constitutional guarantee against double jeopardy. This doctrine precludes a subsequent prosecution only if the jury could not rationally have based its verdict on an issue other than the issue the defendant seeks to foreclose, but if the issue was not necessarily determined in the former trial, the possibility that it may have been does not prevent re-examination of that issue. *United States v. Lee,* 622 F.2d 787, 790 (5th Cir.1980), *cert. denied,* 451 U.S. 913, 101 S.Ct. 1987, 68 L.Ed.2d 303 (1981).

■ In determining whether collateral estoppel applies, a court must examine the record of the prior proceeding, and take into account the pleadings, evidence, charge, and other relevant matter to determine whether a rational jury could have grounded its verdict on an issue other than that sought to be foreclosed. A court must determine: (1) what facts were necessarily determined in the first lawsuit; and (2) whether the State, in a subsequent trial, attempted to relitigate facts necessarily established against it in the first trial. *Dedrick v. State,* 623 S.W.2d 332, 336 (Tex. Crim.App.1981).

■ It is well-established that a verdict of guilty on a lesser-included offense is tantamount to an acquittal of the greater offense. *Turner v. State,* 518 S.W.2d 243, 244 (Tex.Crim.App.1975); *Martinez v. State,* 632 S.W.2d 783, 785 (Tex.App.— Houston [14th Dist.] 1982, no pet.); TEX. CODE CRIM.PROC.ANN., art. 37.14 (Vernon 1981).

The case at bar is controlled by *Green v. Estelle,* 601 F.2d 877 (5th Cir.1979). That case involved the separate prosecution of a defendant for the murder of two victims who were killed almost simultaneously. In that case, the petitioner, Green, and a companion, McDuff, kidnapped two young boys and locked them in the trunk of a car. Later, McDuff, in Green's presence, opened the trunk and fired several pistol shots into it, killing the boys. Green was charged in two separate indictments, one for murder with malice of one victim and the other for murder with malice of the other victim. In the trial on the first indictment, a jury found Green guilty of only murder without malice in the death of one of the victims. The State then tried Green on the second indictment for murder with malice in the death of the other victim.

In reviewing Green's petition for writ of habeas corpus, the Fifth Circuit Court found that the jury in Green's first murder trial had determined the ultimate issue of fact (i.e., the issue of Green's mental state at the time of the shootings) in his favor. The State had argued, as it does in the instant case, that it was not relitigating the same issue of malice in the second trial because Green's state of mind might have changed between the two killings. To this argument, the Court answered:

We reject this contention as patently unreasonable. The record shows that the two boys were killed almost simulta-

neously from a volley of shots fired into the trunk. One cannot tell from the evidence which boy was wounded first or which boy died first. The facts in connection with the two deaths are exactly the same, and Green's conduct in connection with each death was exactly the same. *There is absolutely no evidence indicating a change in Green's intent.* Under these circumstances, we conclude that Green's state of mind did not change.

Since Green's state of mind was the same as to each murder, the state was collaterally estopped under the principles of *Ashe v. Swenson* from relitigating the issue of Green's malice in the second trial. Thus, the conviction of Green for the murder with malice of Brand [under the second indictment] was unconstitutional. *See Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). [Emphasis ours.]

We do not view the facts in the instant case as so significantly different from those in *Green* to support a contrary disposition.

■ Here, appellant did shoot at one officer at a time. The two shots in the instant case are not as indistinguishable as the shots fired in *Green.* However, the facts surrounding the two shots in the instant case are completely intertwined. The only eyewitness to Serna's shooting is the only eyewitness in the second case. The evidence presented to a jury in the second case would be the same as that presented in the first trial. Appellant's conduct was virtually the same towards each victim.

In the capital murder trial, the State did attempt to show that appellant was not acting from sudden passion when he shot Serna. Ayala testified that, after appellant shot Serna, he "smiled sarcastically" and with satisfaction before he fired at Ayala. The jury had all this evidence before them; yet, they found appellant guilty of only voluntary manslaughter. The defense pointed out to the jury that several other officers had testified that they had seen appellant "smile sarcastically" at them at various times during the brawl. The jury was free to attach whatever weight to Ayala's testimony as they deemed appropriate.

It is clear from this record that the two shots came within seconds of each other. The two officers were positioned right next to each other. A ballistics expert testified that the shot to Serna came from between one and twelve feet away. As in *Green,* there is absolutely no evidence in the record that appellant's mental state changed between the first and second shots. The State did not point to any evidence of a change in mental state during either habeas corpus hearing.

Obviously, the appellant's mental state at the time of each shooting is the ultimate issue in each case. Because the factual context of the two offenses is so intertwined, we hold that the jury in the first trial necessarily determined the appellant's mental state at the time he shot at Ayala when it made its determination of his mental state when he shot Serna. In other words, the jury in the first trial could not have rationally based its verdict on an issue other than the one appellant now seeks to foreclose. We should not be understood to hold that appellant cannot be tried for shooting at Ayala. Rather, he cannot be tried for an offense with a mental state greater than the one a jury has already determined he possessed at the time of both shootings.

In its brief, the State argues that *Simien v. State,* 514 S.W.2d 452 (Tex.Crim.App. 1974) is controlling in the instant case. That case also involved the shooting of two victims in rapid succession. The defendant was tried for murder with malice in the death of the first victim, but a jury found him guilty of only murder without malice. He was then tried and convicted of murder with malice in the death of the second victim. The defendant brought the same collateral estoppel challenge as appellant does in this case.

In rejecting the argument, the Court held that *Ashe* and the doctrine of collateral estoppel are not applicable in instances

where the prior trial resulted in a conviction instead of an acquittal. In light of the Fifth Circuit Court's subsequent holding in *Green, Simien* is questionable authority. *See also Ex Parte Green,* 548 S.W.2d 914, 918 (Tex.Crim.App.1977) (Roberts, J., dissenting).

The judgment of the trial court is reversed and remanded with instructions to dismiss the indictment.